1              **IN THE UNITED STATES DISTRICT COURT**
           **FOR THE SOUTHERN DISTRICT OF TEXAS**
2                     **HOUSTON DIVISION**

3   UNITED STATES OF AMERICA        )        NO. 4:16-CR-409
                                    )
4                                   )
    VS.                             )        Houston, Texas
5                                   )        10:58 a.m.
                                    )
6   DOUGLAS RAY                     )        March 30, 2017

7

8      *********************************************************

9                           **SENTENCING**

10           **BEFORE THE HONORABLE ALFRED H. BENNETT**

11                **UNITED STATES DISTRICT JUDGE**

12     *********************************************************

13  APPEARANCES:

14  FOR THE GOVERNMENT:

15       Mr. Arthur R. Jones
         United States Attorney's Office
16       1000 Louisiana, Suite 2300
         Houston, Texas  77002
17       Tel:  713-567-9357

18       MR. Kevin Gingras
         U.S. Department of Justice
19       1301 New York Avenue, Suite LL02
         Washington, DC  20005
20       Tel:  202-714-0735

21  FOR THE DEFENDANT:

22       Mr. Timothy D. Belevetz
         Holland & Knight
23       800 17th St NW, Suite 1100
         Washington, DC  20006
24       Tel:  202-469-5080

25

```
 1  COURT REPORTER:

 2       Ms. Kathleen K. Miller, CSR, RMR, CRR
         515 Rusk, Room 8004
 3       Houston, Texas  77002
         Tel:  713-250-5087
 4
    Proceedings recorded by mechanical stenography.
 5  Transcript produced by computer-assisted transcription.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1  (Defendant Present.)

2              THE COURT:  Cause Number 16-CR-409-001, United

3  States of America versus Douglas Ray.

10:58:33  4              Counsel, please make your appearances for

5  the record.

6              MR. JONES:  Good morning, Your Honor, Rob Jones

7  and Kevin Gingras for the United States.

8              MR. GINGRAS:  Good morning, Your Honor.

10:58:41  9              THE COURT:  Good morning.  Still.

10              MR. BELEVETZ:  Good morning, Your Honor, Tim

11  Belevetz for the defendant, who is present.

12              THE COURT:  Belevetz, is that -- did I do it

13  right?

10:58:54  14              MR. BELEVETZ:  Yes, sir.  Belevetz.

15              THE COURT:  Belevetz.  And, sir, what is your

16  name?

17              THE DEFENDANT:  Douglas Glen Ray.

18              THE COURT:  Let the record reflect that the

10:59:07  19  defendant is present, and is represented by legal counsel.

20              This is a sentencing hearing in this case,

21  and I want to describe the Court's sentencing procedures.

22              The Supreme Court has held in *United*

23  *States vs. Booker* that the United States Sentencing

10:59:22  24  Guidelines are advisory, not mandatory for judges.  *Booker*

requires a sentencing court to consider guideline ranges, but it permits the Court to tailor the sentence in light of other statutory concerns as well.

The Court in the exercise of its sentencing discretion will rely on the factors set out in Section 3553(a) to fashion an appropriate sentence to achieve the Congressionally mandated purposes of sentencing as set forth in the Sentencing Reform Act of 1984. The Court will endeavor to faithfully apply the directives within the guidelines to determine the total offense level and criminal history category under the guidelines.

The Court will exercise its discretion to determine the appropriate sentence. In so doing the Court will give considerable weight to the sentencing range calculated under the guidelines. Any comments by the Court during the course of this sentencing are not to be construed as indication that the Court, in fact, believes that the guidelines are mandatory or that they constrain the Court's ultimate sentencing discretion.

The standard of proof for factual findings in connection with sentencing is preponderance of the evidence. In determining whether that standard is met, a presentence report is generally considered sufficiently reliable to be considered by the trial court as evidence in making the factual determinations required by the

1  sentencing guidelines.

2          In this case, I have received the

3  presence report from the probation office, as well as

4  the addendum to the presence report, the second addendum

11:00:52  5  to the presence report.  I have received a signed

6  victim-impact statement; the order -- preliminary order of

7  forfeiture; the government's motion for 5K1.  Are there any

8  other documents from the government's perspective that the

9  Court should have reviewed prior to today?

11:01:56  10          MR. JONES:  Not that I can think of, Your

11  Honor.

12          THE COURT:  Very well.  Are there any other

13  documents that the Court should have reviewed prior to

14  today from the defense's perspective?

11:02:04  15          MR. BELEVETZ:  Your Honor, I am not sure

16  whether the Court mentioned this, but we filed an objection

17  to the PSR, and then our sentencing position, and that is

18  it.

19          THE COURT:  Very well.  Is it my understanding

11:02:46  20  that the government has no objection to the presence

21  report?

22          MR. JONES:  That is correct, Your Honor.

23          THE COURT:  Very well.  As to the defense, I

24  believe that in regards to your objections, your objection

11:02:59  25  was to the abuse of position of trust, restitution, and

1 financial condition; is that correct, counsel?

2          MR. BELEVETZ:  That is correct, Your Honor,

3 with the first of those three being the primary objection.

4          THE COURT:  Very well.  Counselor.

11:03:20  5          MR. BELEVETZ:  Your Honor, our position on the

6 abuse-of-trust enhancement was laid out in our -- in our

7 objection, but I want to just highlight a few things.

8          The objection is based upon the nature of

9 the -- of the enhancement and, frankly, even the case law

11:03:36  10 here in the Fifth Circuit that governs it.  As the Court is

11 aware, the enhancement applies to instances where the

12 defendant abused a position of public or private trust, or

13 used a special skill in a manner that significantly

14 facilitated the commission or concealment of the offense

11:03:51  15 and I am, of course, quoting 3B1.3.

16          In the application notes, Your Honor,

17 there is a statement that the position of the public or

18 private trust is characterized by professional or

19 managerial discretion; that is, substantial discretionary

11:04:09  20 judgment that is ordinarily given considerable deference.

21 And then the commentary goes on to provide what can

22 probably be described well as three classic examples of a

23 position of trust:  The lawyer who embezzles from a client;

24 the bank executive who runs a fraudulent loan scheme; and

11:04:25  25 the doctor who engages in sexual assault while supposedly

1 performing a medical exam.

2          The guidelines also, as the Court is

3 aware, state that the enhancement applies sort of across

4 the board to mail carriers, given the position of trust

11:04:43  5 that they have been given.

6          The *United States vs. Kay*, Your Honor, is

7 literally the only case in the entire country that has ever

8 addressed the application of the abuse-of-trust enhancement

9 with respect to an FCPA case.  And in that case the Fifth

11:04:59 10 Circuit established a two-part test, which largely comes

11 from the language of the guideline itself.  The first part,

12 first prong, is whether defendant occupied a position of

13 trust; and the second is whether the defendant abused that

14 position of trust in a manner that significantly

11:05:15 15 facilitated the commission of the -- or concealment of the

16 offense.

17          Your Honor, we would submit that Mr. Ray

18 meets neither of these prongs.  He did not occupy a

19 position of trust.  No one placed their trust in him as,

11:05:28 20 for example, a patient places his trust in a doctor, or a

21 client in a lawyer, or possibly even shareholders in a

22 chief executive officer.  He did not abuse his position of

23 trust in a way that significantly facilitated the

24 commission or concealment of the offense.

11:05:48 25          Under *Kay*, Your Honor, that means

1 occupying a position, a superior position, occupying a

2 superior position relative to all people in a position to

3 commit the offense as a result of his job.  That comes

4 directly from the case.

11:06:03   5   Your Honor, Mr. Ray was the owner, the

6 co-owner, of a small business.  He and his wife Sherrie are

7 the only two shareholders.  The company was so small that

8 he did not occupy a superior position relative to anyone

9 else who was in a position to commit the offense, like the

11:06:21   10 defendant in *Kay*.

11   So, in those ways, Your Honor, the

12 defendant is different than the defendant in *Kay*.  He was

13 the chief executive officer of a much larger publicly

14 traded company who directed subordinates to pay bribes, and

11:06:38   15 thereby harmed that company's shareholders.

16   If this enhancement applies, Your Honor,

17 to Mr. Ray for bribing foreign officials, then candidly it

18 must apply to virtually every defendant, and probably every

19 defendant, not virtually, every defendant who has committed

11:06:57   20 an FCPA offense.

21   THE COURT:  Very well.  Any response from the

22 government?

23   MR. JONES:  Briefly, Your Honor.  Certainly,

24 every case involving any type of fraud has some type of

11:07:10   25 general abuse of trust in it.  Regarding the specific

enhancement, however, we do agree with several of the
points that the defense has brought up in that the facts,
the specific facts, of this case on the FCPA count, do not
necessarily rise to the level of the same type of abuse of
11:07:30   trust that you saw in *Kay*.  And it is a small company.  It
was -- he committed the offense, and the defendant
committed the offense with Mr. Hernandez, who the Court is
well aware of the facts of that case.  And Mr. Hernandez
was somebody who was -- certainly appeared to be at some
11:07:51   level actively soliciting the bribes and/or payoffs in that
case, which makes it a little bit different.

            And, of course, we understand that the
Court can and should consider all of the facts of the
commission of the offense, of how the defendant committed
11:08:06   it, in assessing sentence, whether or not a certain
provision applies or not.  The facts are what govern your
decision in this case, ultimately.

            And we also look at the fact that we do
think it is significant, and we will be arguing it in the
11:08:24   sentence, that this was, you know, essentially the business
model of the defendant, was just going and getting some
people involved in whoever the company or entity was, an
insider, so to speak, to help the commission of the offense
and the fraud scheme and ultimately the kickback scheme
11:08:39   which resulted in the crimes in this case.

1          We do think that abuse of trust as a
2    guideline enhancement would probably be more applicable to
3    Count 2, in the sense that that is a general wire-fraud
4    count being perpetrated by the defendant and his company,
11:08:59  5    but we don't necessarily think on the facts of this case
6    that would necessarily apply either.  If it was a situation
7    where this defendant had a business relationship with a
8    company for 20 years or so, and had come to acquire the
9    trust of that company as somebody who was, you know, this
11:09:18  10   company and this defendant is completely reliable,
11   everything has been proven 100 percent true over the years,
12   and then began a scheme where he was abusing that trust
13   that he had developed, then I think that might be a
14   different scenario.  But that isn't the facts of this case.
11:09:32  15         What we have here are relationships that
16   began kind of instantaneously with this fraudulent business
17   model, so it was kind of a scheme from the beginning and
18   with an insider in every case.
19         So, I guess that's kind of a long way of
11:09:46  20   saying that we don't necessarily disagree with what
21   Mr. Belevetz raised.  We are not saying the probation
22   office is wrong.  We understand why they scored it that way
23   and how they scored it that way, but I don't believe that
24   *Kay* really intended to go that specific, and that broadly
11:10:08  25   in its application of that abuse-of-trust guideline.  We

1 certainly think in the FCPA context that could be something

2 that would apply in the facts of the case; but in this

3 case, and in this circumstance, we don't believe it does

4 apply.

11:10:22  5                    And we have also factored all of those

6 things that I have just discussed into our ultimate

7 recommendation that we did make with our motion under seal;

8 and depending on how the Court scored it, we may be making

9 a slightly different recommendation.  But we have taken all

11:10:36  10 of that into account with this defendant, who has

11 cooperated in this case.  So I guess, again, it is a long

12 way of saying we don't necessarily disagree with

13 Mr. Belevetz.

14                    THE COURT:  The objection is sustained.

11:10:52  15                    Counselor, any other objections that the

16 Court needs to turn its attention to?

17                    MR. BELEVETZ:  No, Your Honor.

18                    THE COURT:  Very well.  Who is here from

19 probation?

11:11:01  20                    PROBATION OFFICER GARCIA:  Jesus Garcia for

21 probation, Your Honor.

22                    THE COURT:  Mr. Garcia, I believe, with the

23 Court sustaining that objection by the defense from the

24 presentence report that takes the total offense level to

11:11:14  25 29.  Under my quick check under 29, and a criminal history

1  category of one, the range is 87 to 108.  Is that correct?

2          PROBATION OFFICER GARCIA:  It is, Your Honor.

3          THE COURT:  And does that change the term of

4  supervised release?

11:11:32  5          PROBATION OFFICER GARCIA:  It does not.

6          THE COURT:  Does it change the fine?

7          PROBATION OFFICER GARCIA:  It does.  Let me

8  look at that, Judge.

9          THE COURT:  Very well.

11:11:53  10          PROBATION OFFICER GARCIA:  It remains the same,

11  Your Honor.

12          THE COURT:  Very well.  Thank you, sir.

13              Mr. Ray.

14          THE DEFENDANT:  Yes, Your Honor.

11:12:15  15          THE COURT:  Your attorney has gone through the

16  presentence report and made legal objections to them.  Have

17  you and your attorney discussed the presentence report?

18          THE DEFENDANT:  Yes, Your Honor, we have.

19          THE COURT:  Has he explained it to you and

11:12:28  20  answered all of your questions?

21          THE DEFENDANT:  Yes, Your Honor, he has.

22          THE COURT:  Do you have any objections to the

23  presentence report?

24          THE DEFENDANT:  No, Your Honor, I do not.

11:12:35  25          THE COURT:  Very well.  Thank you, sir.

1           THE DEFENDANT:  Thank you.

2           THE COURT:  These are the Court's final

3    guideline findings and legal conclusions:  The total

4    offense level is 29; the criminal history category is 1.

11:12:48   5    Based upon those determinations, the guidelines suggest as

6    follows:  A term of imprisonment of 87 to 108 months, a

7    term of supervised release of one to three years, a fine of

8    15,000 to $150,000.  In addition based upon the findings,

9    restitution is due in the amount of $589,698.87 as well as

11:13:20   10   a $200 special assessment.

11           What is the government's position on

12   sentencing?

13           MR. GINGRAS:  Your Honor, we think this was a

14   serious offense.  You have now seen a couple of these cases

11:13:38   15   and understand the seriousness of this offense, especially

16   the FCPA portion.  And we think, as Mr. Jones said earlier,

17   this was a business model.  And I think he said in his

18   sentencing memo he inherited it from his father, so it's

19   been one that has been ongoing for a while.

11:14:03   20           And this is an industry, I think, looking

21   at the deterrence factors of 35 -- 3553, that -- where they

22   need to understand that this is -- this is a serious

23   offense.  That being said, the defendant certainly accepted

24   responsibility, has provided substantial assistance to the

11:14:27   25   government, went through his cooperation, as the Court is

1   aware through our motion, and in light of the -- your

2   ruling on the abuse of trust, which provides a range of 87

3   to 108 months, the government is recommending that a

4   sentence of 58 months, which would be about a third -- or

11:14:48   5   which would be a third off of the bottom of that guideline

6   range would be a reasonable and appropriate sentence, and

7   address the 3553(a) factors, including the seriousness of

8   the offense and provide adequate deterrence.

9          THE COURT:  Very well.  What is the defense's

11:15:04   10   position on sentencing?

11         MR. BELEVETZ:  Your Honor, we want to emphasize

12   that Mr. Ray accepts full responsibility for his conduct.

13   He paid bribes to foreign officials and employees of

14   private customers in order to win business for Global

11:15:22   15   Aviation.

16          From the beginning of his investigation,

17   Your Honor, he has demonstrated a desire to own up for what

18   he did.  He appears before Your Honor this morning contrite

19   and remorseful.

11:15:36   20          Mr. Ray's father passed away in 1994 and

21   when that happened Mr. Ray inherited a business with bad

22   and, indeed, unlawful business practices that had already

23   been in place.  To call this, however, a fraudulent

24   business model, I believe, is a significant overstatement.

11:15:53   25          Kickbacks, commissions, bribes were not

1 paid to each and every customer. They were typically done

2 in one of two instances: Where the -- there had already

3 been a preexisting practice of paying the bribes that had

4 been established before Mr. Ray came onto the scene;

`11:16:13` 5 second, there are instances where with respect to new

6 customers, the -- the point of contact within the

7 customer -- there is always a point of contact. There is a

8 pilot who maintains the aircraft or a mechanic who

9 maintains the aircraft, and that is the person with whom

`11:16:29` 10 Mr. Ray would interface. These are the individuals who

11 would typically make the request for the payment.

12 One thing I would like to add, Your Honor,

13 is in the victim-impact statement that was tendered by the

14 Reaud law firm, the Court will recall that there were two

`11:16:47` 15 statements from the mechanic from that -- from that

16 company, that law firm, a Tino DePaulis, and Mr. DePaulis

17 claims that Mr. Ray is the one who initiated the

18 arrangement. We dispute that. Mr. Ray did not initiate

19 the arrangement. In fact, Mr. DePaulis did. And that's

`11:17:06` 20 consistent with what is on the record with regard to other

21 customers and that is reflected in the presentence report.

22 Now, to be sure when these requests were

23 made, he accepted the requests, and he did pay the

24 kickbacks. He understood -- Mr. Ray understood that is the

`11:17:24` 25 way business was done in Mexico; and sadly, for better or

worse, and clearly for worse, that's -- that is, in fact,

often the case.  I don't offer that to excuse the conduct

but rather to provide some context in which -- in which the

payments were made.

11:17:41    Mr. Ray did not have an affirmative desire

to defraud, and I think that is important for the Court to

understand.  This was not, in other words, a predatory type

of scheme.  He wanted to obtain business in a competitive

market, but he had no intention of ripping off his

11:18:00 customers.  His goal was to provide high-quality work and

parts at competitive prices.  And even in Mr. DePaulis's

statement you can see that that was, in fact, the case.  He

provided good value to the customer and provided high

quality work.

11:18:14    A common theme, Your Honor, among the

letters that we have submitted to the Court is the strength

of Mr. Ray's character.  He has a big heart.  He has a

generous heart.  And throughout his life he has helped

others with no expectation of anything in return.

11:18:28    He provided a welcoming home to his

stepdaughter when he and his wife, Sherrie, got married.

He provided employment and training skills to those who

needed a hand.  And love and support to his family,

including his son, Ryan, who is here in the courtroom this

11:18:44 morning, to whom he is teaching the trade; and to his new

1 daughter-in-law Michelle, Ryan's -- Ryan's new wife.

2                I would like to talk briefly, Your Honor,

3 about the cooperation that Mr. Ray provided.  The

4 government has filed a motion, as the Court is aware, under

11:18:59  5 5K1.1 in recognition of the substantial assistance that

6 Mr. Ray has provided.  He has cooperated with the

7 government from day one.

8                He made himself available for debriefings,

9 both formal and informal, on numerous occasions.  He has

11:19:13  10 corroborated the evidence that the government had

11 developed, and he has explained the evidence that the

12 government had developed and already had.

13                He helped the government develop new

14 evidence against others by cooperating proactively.  He

11:19:27  15 worked with the government to obtain evidence through

16 recorded telephone calls and e-mail exchanges.  He met --

17 even met with targets of the investigation while wired, in

18 other words face-to-face meetings, in order to obtain

19 evidence.  And that worked.  Mr. Ray's efforts have lead to

11:19:44  20 the successful prosecution of co-defendant Victor Valdez,

21 who this Court sentenced last month.

22                The only thing, Your Honor, that Mr. Ray

23 did not do as part of his cooperation is provide trial

24 testimony.  He never had the opportunity to do so.  Had

11:20:01  25 that been presented to him, he certainly would have.  This

1  isn't unusual in FCPA cases.  As the Court is probably

2  aware, they typically don't go to trial.

3                    In short, Your Honor, Mr. Ray did

4  everything the government asked of him, and did it

11:20:14  5  willingly and timely.

6                    I would like to address the other

7  sentences that -- that individuals have received in FCPA

8  matters.

9                    We are asking, Your Honor, for a

11:20:25  10  below-guideline sentence of 18 months, and this is

11  appropriate in the context of the sentences that others

12  have received.  It is nearly 25 percent longer than the

13  average sentence received by defendants who have been

14  convicted for FCPA offenses, but not money-laundering

11:20:41  15  offenses, over the last six years, six and a half years

16  nearly, which is 14.6 months.  That is the average

17  sentence for defendants who have not been convicted of a

18  money-laundering offense.  If you tack on money-laundering

19  offenses which, of course, carry a higher statutory

11:20:59  20  maximum, that average sentence is 23 months, and that is

21  reflected in Exhibit 2 to our sentencing position.

22                    It is also, Your Honor, consistent with

23  the sentences similarly situated defendants in aircraft

24  maintenance and aviation FCPA cases have received recently.

11:21:15  25                    I want to call to the Court's attention

the case of Peter DuBois and Neal Uhl, who were sentenced

in the Northern District of Oklahoma.  They were both

executives with BizJet.  BizJet is a subsidiary of

Lufthansa and was engaged in a similar business, aircraft

maintenance and repair.

These two individuals bribed some of the

same Mexican agencies that Mr. Ray bribed.  And at least in

the case of Mr. DuBois, ended up with a guideline range of

108 to 120 months.  It's 120 because he was statutorily

capped at that.

Both Defendants, both Mr. DuBois and

Mr. Uhl, received sentences of straight probation with

eight months -- a special condition of eight months of home

detention.  Very similarly situated in terms of the facts,

and the -- and the guideline range.

I want to draw to the Court's attention

the case of Mr. Perez, Daniel Perez, and Kamta Ramnarine.

They were sentenced in the Southern District of Texas, in

the Brownsville Division, to straight probation.  These

were also individuals -- these are related cases, the Court

is aware.  These are cases where these two individuals were

employees of an aircraft maintenance and service -- repair

company called Hunt Pan Am Aviation in Brownsville, who

paid bribes to Mexican officials, including Ernesto

Hernandez, who was also involved in this case.

1    They're also consistent -- this is also --

2   the 18 months recommended term of incarceration, Your

3   Honor, is also consistent with the sentences that this

4   Court has imposed on co-defendants in this case.  Mr.

11:22:57    5   Hernandez was sentenced by this court to 24 months.  He is

6   arguably more culpable than Mr. Ray.

7    He was the one who initiated the request

8   for payment.  He is the one who worked at the Mexican

9   government agency, the state of Tamaulipas -- excuse me --

11:23:15   10   and who owed a duty of loyalty and who abused the position

11   of trust with respect to his employer, that Mexican state.

12   This Court sentenced Mr. Hernandez to 24 months.

13    Mr. Valdez is the other co-defendant in

14   this matter, and this Court a few weeks ago sentenced him

11:23:34   15   to a year and a day.  Mr. Valdez's conduct is not as

16   egregious, not as extensive as Mr. Ray's.  Mr. Valdez was

17   Mr. Ray's local agent in Mexico, who helped broker a lot of

18   these deals.  Mr. Ray's conduct, Your Honor, we would

19   submit, fits in somewhere in-between that of Mr. Hernandez

11:23:55   20   and Mr. Valdez.

21    Your Honor, for these reasons, we would

22   ask the Court to impose a sentence of 18 months, taking

23   into account Mr. Ray's contrition, his remorse, his

24   immediate and extensive cooperation, his character, the

11:24:14   25   fact that this really was a one-off aberration.  It is

1 something that he understands was unlawful.  As we

2 mentioned in our sentencing brief, he has learned his

3 lesson and has learned it well.

4             He intends to do important work in the

11:24:30  5 future, continuing the business of the company, teaching

6 his son, Ryan, the trade, and continuing to maintain

7 aircraft and provide safe aircraft for his customers.

8             THE COURT:  Thank you, counselor.

9             Mr. Ray, this is your opportunity to

11:24:53 10 address me, and to tell me anything that you wish me to

11 consider.  As your counselor has pointed out, I have been

12 involved in this case with two of your other co-defendants,

13 and two other co-defendants were sentenced by this Court,

14 in another division.

11:25:20 15             I sustained your counselor's objection to

16 the abuse-of-trust point that he raised; but without

17 question, you were in a position to, put it bluntly, know

18 better as a CEO of a company, a citizen of this country,

19 knowing what our expectations are for citizens to do when

11:25:58 20 it comes to the laws of this country.

21             Having stated that, as your counselor has

22 also noted, in regards to two of your co-defendants, by my

23 view, you do fall somewhat in-between or perhaps in the

24 same category as Mr. Hernandez, but I want to hear from you

11:26:25 25 as to your explanation, and for what you wish for me to

1 consider.  Mr. Ray.

2            THE DEFENDANT:  Your Honor, thank you for this

3 opportunity.  I do agree with you.  I could have stopped

4 this at any time.  My counsel was right.  It was a business

11:26:41  5 practice inherited from my father.  I am remorseful for

6 that.  I wish that it never happened.  I have brought down

7 my wife.  My son has had to change his life.  Victor Valdez

8 is now in prison because of that, too, and I at any time

9 could have told him no.

11:27:00  10            It is the way that business is done in

11 Mexico.  It doesn't mean that is the way we have to do

12 business here.  I should have set an example in this

13 industry.  I have been asked a couple of times since that

14 day for the same thing.  Not only have I said no, but I

11:27:15  15 have explained to them, without going into details of my

16 own conflict I am going through, why that -- they shouldn't

17 be doing that, and the consequences that I am now seeing to

18 those customers that -- why they shouldn't do it.  And I

19 hope I have made an impact in their life, to knowing that

11:27:30  20 they should not do that.

21            And if Your Honor will let me, I have a

22 couple of things I would like to do some public apologies

23 to, if I may take this opportunity.

24            First of all, I would like to apologize to

11:27:40  25 my God.  In Luke 12 it says that he will provide for all my

needs.  I didn't let Him do that.  I took things into my

own account.  I do trust in Him, and He always provided for

me.  Yet, these circumstances, I went outside that realm

and operated outside of His guidelines, and here I stand

today because of that.

I would like to apologize to the citizens

of Mexico, the people who pay the taxes that brought the

airplanes to us.  Those funds were used incorrectly.  I see

those citizens down there.  It's a poor country, and I

realize that money is pretty tight down there, and I abused

that, that position that I had, and let them down.

I -- also with the Reaud law firm and a

couple other private companies, they placed a confidence in

me that not only will I deliver a safe airplane, but I will

have their best interest at heart, and I did not.  I was

allowed to -- I allowed others to dictate how I did that

business, and that will not happen again.

I would like to apologize to my wife, who

has been going down this road with me for probably

two-and-a-half years with a civil suit.  It has taken an

emotional toll on her, a physical toll.  She will now be

left to make decisions, with my incarceration, and to try

to carry on the best she can.

I am the primary salesperson at the

company so this is going to be a struggle.  That is the

1  reason I brought my son in to try to at least help that.

2  He is doing a great job.  She made a covenant with me 32

3  years ago for better or for worse, and this is definitely

4  the worst.  So I just want to say -- tell her thank you

11:29:25  5  right now, and it's very important to me.  It has helped me

6  get through this.

7                     To my son, who has stayed in the house

8  with his new bride, moved into the business, postponed his

9  education, postponed his -- his plans for his future and

11:29:43  10  what he wants to do -- he wants to do law enforcement -- I

11  tell him thank you for that and I hope one day I can repay

12  him.

13                     He has -- about three years ago he came

14  home with a tattoo on his arm that says "family."  I didn't

11:29:59  15  think much of it, but he has sure shown that that is not

16  just letters on his arm.  That's -- that's --

17                     To my two daughters I have not told yet

18  because I am ashamed, to the United States of America, I

19  apologize for having spent their resources on this.  They

11:30:27  20  could have been utilized elsewhere.  It was never my

21  intention to defraud, after going through this, but just to

22  bring business to the company.  I would also like to also

23  apologize to the Court for its time, that they are having

24  to do this also.

11:30:45  25                     Moving forward, I have become more aware

1  of my conduct and the laws concerning it.  I am an advocate

2  about this conduct, and would continue to be so if asked,

3  or have the opportunity to share.  I know this has no place

4  in our society.  It does create an unfair advantage for

11:31:03  5  other people, for other businesses.

6  I stand here for the unspoken victims of

7  this crime, the citizens of Mexico, the private companies.

8  I ask for their forgiveness.

9  I would also like to say one other thing,

11:31:22  10  that all through this, the prosecutors, the agents, the

11  probation officers, everybody has treated me with respect

12  and dignity, and I don't feel like I deserve it, but they

13  did.  And I thank you guys.  That's it.

14  THE COURT:  Thank you, sir.

11:31:42  15  Have a seat.  The Court had noted earlier

16  that it was in receipt of a victim-impact statement.  The

17  Court has reviewed that victim-impact statement.  Are there

18  any victims here who wish to give a statement?

19  MR. JONES:  I don't believe we have any, Your

11:32:16  20  Honor.

21  THE COURT:  Very well.  Anything else from the

22  government?

23  MR. GINGRAS:  Nothing, Your Honor.

24  THE COURT:  Anything else from the defense?

11:32:24  25  MR. BELEVETZ:  No, Your Honor.

1          MR. JONES:  Your Honor, there is one issue the

2    probation officer brought to my attention.  There is

3    restitution amounts that are listed in the presentence

4    report as amended by the objections.  I think it's a -- the

5    Court stated it earlier, I think it's a $598,000.

6          THE COURT:  589,698.87.

7          MR. JONES:  Yes, Your Honor.  And the bulk of

8    that is from the Reaud law firm and the injury that they

9    suffered, financial injury.

10          Now, Mr. Reaud submitted the victim-impact

11    statement, and I think in there, there is a slightly

12    different amount; and so, I do believe it is necessary for

13    the Court to make a ruling on the issue of restitution.  I

14    would say that the restitution amount in the presentence

15    report regarding the Reaud law firm, the 533,000, or

16    whatever the exact amount was, we believe that is correct.

17          I am not saying Mr. Reaud is providing

18    false information to the Court or anything like that.  We

19    don't know exactly all of the ins and outs of how he came

20    up with that, but it is a little bit higher.  We think that

21    the amount in the presentence report is correct, and that

22    should be the amount on the judgment.  And I do believe

23    that the Reaud law firm, this is a really --

24          THE COURT:  Where is the amount in that -- the

25    contrary amount?  I am looking at that and I don't see it.

1 Oh, I see it.  557?  Is that the contrary amount you are

2 referring to?

3          MR. JONES:  Yes, Your Honor, from the

4 victim-impact statement.

11:35:09    5          THE COURT:  Very well.  Thank you.

6          MR. JONES:  And the Reaud law firm does have --

7 and I know it isn't binding on this Court or anything, but

8 they do have, I believe, still the civil lawsuit going on.

9 Of course, there are many other remedies that a victim like

11:35:22    10 that can take to make themselves whole, even if they

11 thought this Court didn't do that.  We just wanted to bring

12 that to the Court's attention.

13          THE COURT:  Very well.  Thank you.

14                 The Court has considered the guidelines

11:36:40    15 and finds a departure is warranted.  Pursuant to the

16 Sentencing Reform Act of 1984, it is the judgment of the

17 Court that the Defendant Douglas Ray is hereby committed to

18 the custody of the Bureau of Prisons to be imprisoned for a

19 term of 18 months as to Count 1, and as to Count 2 an

11:37:08    20 additional 18 months to be served concurrently.

21                 While on supervised release, the defendant

22 shall not commit another federal, state or local crime,

23 shall comply with the standard conditions that have been

24 adopted by this Court under General Order Number 2017-01,

11:37:24    25 abide by any mandatory conditions required by law, and

shall comply with the following additional conditions:

You must cooperate in the collection of a DNA sample as directed by the probation officer.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon, or anything -- anything else that was designed to cause bodily injury.

You must provide the probation office access to any requested financial information and authorize the release of any financial information.  The probation officer may share the information with the United States Attorney's Office.

It is further ordered that the defendant shall pay restitution totaling $589,698.87 as outlined in the presentence report.  The defendant's restitution obligation shall not be affected by any restitution payments that may be made by other defendants in this case except that no further payments shall be required after the sum of the amounts paid by all defendants has fully covered all the compensable losses.

It is further ordered that the defendant shall pay to the United States a special assessment of $200.  The Court finds that the defendant does not have the ability to pay a fine, and the Court will waive a fine in this case.

Having assessed the defendant's ability to

1 pay, payment of the total criminal monetary penalties shall

2 be due as follows:  The defendant shall make a lump-sum

3 payment of $200 due immediately, balance due in 25 percent

4 of any wages earned while in prison in accordance with the

11:38:59  5 Bureau of Prisons Inmate Financial Responsibility Program.

6 Any balance remaining after release from imprisonment shall

7 be due in monthly installments of $300 to commence 60 days

8 after release from imprisonment to a term of supervision.

9 Payment is to be made through the United States District

11:39:18  10 Clerk, Southern District of Texas.

11           Anything else from the defense -- I mean,

12 from the government?

13           MR. JONES:  Your Honor, I may have just missed

14 it, but did the Court assess a supervised-release term?

11:39:28  15           THE COURT:  Yes.  I apologize.  A term of

16 supervised release of three years.

17           MR. JONES:  Thank you, Your Honor.  And just

18 one other thing, there is an unopposed motion for

19 preliminary order of forfeiture in the case.

11:39:44  20           THE COURT:  Yes, I have that order.

21           MR. JONES:  And with the --

22           THE COURT:  Hold on.

23           MR. JONES:  I'm sorry.  With the proposed

24 order?

11:39:52  25           THE COURT:  I have it and that order has been

1 signed.

2              MR. JONES:  That is all we have, Your Honor.

3              THE COURT:  Anything else from the defense?

4              MR. BELEVETZ:  No, Your Honor.

11:40:01  5              THE COURT:  Probation?

6              PROBATION OFFICER GARCIA:  No, Your Honor.

7              THE COURT:  Very well.  Mr. Ray --

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  -- your statement here today moved

11:40:12  10 the Court, and not only your apology to the citizens of

11 Mexico, the citizens of this country, but the Court noted

12 the apology to your family as well as the prosecutors and

13 the probation officers involved in this case.

14              I hope that you're good at your word, and

11:40:44  15 that you will serve as a model to others in this business

16 to make sure that they don't walk this road because this is

17 the consequence of those decisions.  And I hope that when

18 you return to your family, and you return to your business,

19 you are a better man for the experience, and that you are a

11:41:06  20 role model for those who are likewise engaged in this

21 business.

22              THE DEFENDANT:  I am, Your Honor.  Thank you.

23              THE COURT:  Mr. Ray, you can appeal your

24 conviction if you believe that your guilty plea was

11:41:18  25 unlawful or involuntary, or there is some other fundamental

1  defect in the proceeding that was not waived by your guilty

2  plea.  Under some circumstances, the defendant also has the

3  right to appeal the sentence; however, a defendant may

4  waive that right as part of the plea agreement, and you

11:41:33  5  have entered into a plea agreement which waives some or all

6  of your rights to appeal the sentence itself.  Such waivers

7  are generally enforceable; but if you believe that waiver

8  itself is not valid, you can present that theory to the

9  appellate court.

11:41:48  10          If you appeal, that appeal must be filed

11  within 14 days of the entry of judgment.  If you cannot

12  afford to pay the costs of appeal, you can ask to proceed

13  without payment of costs, and you have the right to have an

14  attorney appointed to represent you on appeal if you cannot

11:42:02  15  afford an attorney.

16          Counselor, as to remand, what say you?

17          MR. JONES:  Well, if they make a motion to stay

18  out and voluntarily surrender, we are not opposed to that.

19  I presume they will.

11:42:17  20          MR. BELEVETZ:  We do make that motion, Your

21  Honor, and I would like to just add one more thing.

22  Recognizing fully what the Court advised counsel for the

23  defendant in the prior proceeding said, we would like to

24  recommend -- ask the Court, rather, to recommend to the BOP

11:42:30  25  a designation to a facility as close to Houston as

1 possible.  And if the Court is inclined to do so

2 specifically, FPC Bastrop.

3          THE COURT:  An order in regards to the motion

4 to voluntarily report, that motion is granted without

11:42:50  5 objection.

6          Mr. Ray, while you have been out on bond,

7 pending this sentencing hearing, there were certain

8 conditions that were imposed upon you.  Those conditions

9 remain in effect until your report date when you are so

11:43:07 10 notified by the Court.  Do you understand?

11          THE DEFENDANT:  I do, Your Honor.

12          THE COURT:  Very well.  As to counsel's second

13 request regarding a recommendation to BOP, I am not

14 inclined to do so at this time.

11:43:20 15          Once BOP has made an assignment, and if

16 you have issue with it, then bring that to the Court's

17 attention.  But as to making a preemptive strike, so to

18 speak, as to what their discretion requires based upon

19 their facilities, the Court is not inclined to do so at

11:43:39 20 this time.

21          MR. BELEVETZ:  Understood.

22          THE COURT:  Very well.  Anything else from the

23 government?

24          MR. JONES:  No, Your Honor.

11:43:41 25          THE COURT:  Anything else from the defense?

1        MR. BELEVETZ:  One more minor thing, Your

2 Honor.  Mr. Ray, if it is acceptable to the pretrial

3 services office, officer, and to the Court, would like to

4 pay a visit to his daughter and grandchildren who live in

11:43:58  5 Oklahoma City.  It would be a two-night trip.  It would be

6 next weekend, beginning Friday, returning Sunday.

7        THE COURT:  Typically, the Court has not

8 approved travel out of state for social travel.  I have

9 allowed travel out of state for medical and to attend

11:44:28  10 funerals, and the like.  But typically, I have not -- with

11 all due respect, Mr. Ray is a convicted felon and there are

12 certain consequences that come with that.  And so with that

13 being said, that request is denied.

14        Anything else from probation?

11:44:48  15        PROBATION OFFICER GARCIA:  No, Your Honor.

16        THE COURT:  Very well.  We're adjourned and you

17 are excused.

18        MR. JONES:  Thank you, Your Honor.

19        (Concluded at 11:45 a.m.)

20        COURT REPORTER'S CERTIFICATE

21    I, Kathleen K. Miller, certify that the foregoing is a

22 correct transcript from the record of proceedings in the

23 above-entitled matter.

24        /s/ _____

DATE: April 5, 2017    Kathleen K. Miller, RPR, RMR, CRR

25